IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MINERVA SURGICAL, INC.<br><br>    Plaintiff and Counterdefendant,<br><br>vs.<br><br>HOLOGIC, INC. and CYTYC SURGICAL PRODUCTS, LLC,<br><br>    Defendants and Counterclaimants. | C.A. NO. 18-00217-JFB-SRF<br><br>**MEMORANDUM AND ORDER** |

This matter is before the Court on the parties' cross-motions for summary judgment on the issue of invalidity. D.I. 208 and D.I. 210. Plaintiff Minerva Surgical Inc. ("Minerva") seeks a summary judgment of validity of U.S. Patent No. 9,186,208 ("the '208 patent") and defendants Cytyc Surgical Products, LLC's and Hologic, Inc. (collectively, "Hologic") seek a declaration that the asserted claims of the '208 patent are invalid under 25 U.S.C. § 102(b).[1] This is an action for patent infringement under 35 U.S.C. § 271 *et seq.* The parties' motions on invalidity are dispositive of the action herein.

---

[1] Also pending are Minerva's motions for a partial summary judgment of validity under 35 U.S.C. § 112 (D.I. 198); for partial summary judgment that the accused product meets specific claim requirements (D.I. 200); for partial summary judgment on Hologic's affirmative defenses and counterclaims (D.I. 204); and Hologic's motions for a summary judgment of no infringement (D.I. 206); for a summary judgment of no lost profits (D.I. 211); and for a summary judgment of no willful infringement (D.I. 214). In light of the Court's resolution of the invalidity issue, it need not reach those motions and they will be denied as moot. *See Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1356 (Fed. Cir. 2001)

Hologic argues that the asserted claims of the '208 patent are invalid under the public display or on-sale bar of § 102(b) because Minerva displayed an embodiment of the purported invention, its "Aurora" endometrial ablation device prototype at the 38th Global Congress of Minimally Invasive Gynecology sponsored by the American Association of Gynecologic Laparoscopists on November 16-19, 2009 ("AAGL 2009"). Minerva counters that Hologic's evidence does not show that any device at Minerva's trade-show booth embodied the asserted claims. Minerva argues that the evidence on which Hologic relies does not amount to clear and convincing evidence of public use and contends the '208 patent was not ready for patenting at the time of the AAGL Conference in 2009. It proposes a timeline wherein the accused product was conceived less than a week after the conference and diligently reduced to practice.

Conversely, Minerva moves for a summary judgment declaring that the '208 patent is valid.[2] Specifically, Minerva seeks a declaration that no Minerva prototype was "in public use" as of November 2009 and cannot be used to invalidate the '208 Patent under 35 U.S.C. §102(b).[3]

I.   FACTS

The following facts are gleaned from the Court's earlier orders and from the parties' agreed facts. *See* D.I. 80; D.I. 130, Orders; D.I. 335, Proposed Pretrial Order, D.I. 335-1, Ex.1, Statement of Uncontested Facts. Minerva and Hologic are competing suppliers

---

[2] It seeks partial summary judgment in its favor on Hologic's Third Affirmative Defense (Invalidity) and Hologic's Counterclaim Count II for Declaratory Judgment of Invalidity of U.S. Patent No. 9,186,208 (the "'208 Patent") for failure to meet the conditions of patentability set forth in 35 U.S.C. §102.

[3] Minerva no longer seeks a declaration Hologic's "flex-beam" design is not invalidating prior art under 35 U.S.C. § 102(g) and Hologic's U.S. Patent No. 9,693,890 (the "'890 Patent") is not prior art to the '208 patent and cannot be used to support Hologic's Section 102(g) invalidity defense.

of endometrial ablation devices to treat Menorrhagia, also known as Abnormal Uterine Bleeding or AUB, which is menstrual bleeding that is abnormally heavy in amount and/or duration. *Id.* Endometrial ablation is a transcervical surgical technique in which the lining of the uterus is destroyed with the goal of preventing further bleeding. D.I. 335-1, Ex. 1 at 4. Hologic's NovaSure ADVANCED, NovaSure CLASSIC, and Minerva's Endometrial Ablation System are indicated for use on pre-menopausal women with menorrhagia (excessive bleeding) due to benign causes of whom childbearing is complete. D.I. 335-1, Ex. 1 at 3-5, Statement of Uncontested Facts.

These devices are designed to insert an expandable and contractible frame into the patient's uterus through the cervical canal. D.I. 80 at 1. The frame consists of "inner" and "outer" elements, also called flexures or struts, that expand to bring a membrane into contact with the uterine cavity. *Id.* Once in place, the membrane is used to apply energy sufficient to destroy the uterine lining. *Id.*

The '208 patent is entitled "Systems for Endometrial Ablation." D.I. 335-1, Ex. 1, Statement of Uncontested Facts at 1. The '208 patent was issued by the United States Patent and Trademark Office on November 17, 2015. *Id.* Csaba Truckai and Akos Toth are listed as inventors on the '208 patent. *Id.* Minerva is listed on the '208 patent as the Assignee. *Id.* The '208 patent expires on August 23, 2029. *Id.* at 2. The '208 patent issued from U.S. Patent Application No. 13/667,774 ("the '774 application"), which was filed on November 2, 2012. *Id.* The '774 application is a continuation-in part of U.S. Patent Application No. 13/267,258, filed on October 6, 2011, which claims the benefit of Provisional Application No. 61/394,693, filed on October 19, 2010, and Provisional

3

Application No. 61/556,675, filed on November 7, 2011. *Id.* The application relevant to the present motion is Provisional Application No. 61/556,675, filed on November 7, 2011.

Hologic started selling NovaSure ADVANCED in February 2017 in the United States.[4] *Id.* Hologic markets and sells NovaSure ADVANCED throughout the United States. *Id.* at 3. Hologic markets and sells NovaSure CLASSIC throughout the United States. *Id.* at 21. Minerva markets and sells its Endometrial Ablation System throughout the United States. *Id.*

Minerva alleges that Hologic infringes independent Claim 13 and dependent claims 14-15, 17-18, and 20-23 (the "Asserted Claims") of the '208 Patent. Independent claim 13 of the '208 patent reads as follows:

> A system for endometrial ablation comprising:
>
> an elongated shaft with a working end having an axis and comprising a compliant energy-delivery surface actuatable by an interior expandable-contractable frame; the surface expandable to a selected planar triangular shape configured for deployment to engage the walls of a patient's uterine cavity; wherein the frame has flexible outer elements in lateral contact with the compliant surface and flexible inner elements not in said lateral contact, wherein the inner and outer elements have *substantially dissimilar material properties*.

D.I. 1-2, Ex. B at 35, '208 Patent, Claim 13 (emphasis added). The other asserted claims are dependent on claim 13. *Id.* Because Hologic does not dispute that all other requirements of the single asserted independent claim are literally present in the accused

---

[4] Hologic's predecessor, Novacept, Inc., received FDA premarket approval for commercial distribution of the NovaSure system on September 28, 2001." D.I. 335-1, Ex. 1, Statement of Uncontested Facts at 2. The NovaSure product first sold in the market was referred to internally at Hologic as NovaSure "Gen 2." *Id.* NovaSure CLASSIC is also referred to internally at Hologic as NovaSure "Gen 3" and as project "Protostar." *Id.* NovaSure 6mm sold in the market was referred to internally at Hologic as NovaSure "Gen 4" and as project "Raven." *Id.* NovaSure ADVANCED is also referred to internally at Hologic as NovaSure "Gen 4.1." *Id.*

4

product, the focus of this case is on the '208 patent's requirement that the inner and outer elements have "substantially dissimilar material properties" ("SDMP"). D.I. 247, Minerva's Answering Brief at 1 n.3; D.I. 279, Reply Brief at 13. The record shows, and the parties agree, that the priority date for the SMDP claim of the patent is November 7, 2011, which is the date patent application No. 61/556,675—the first application containing the SMDP limitation—was filed. D.I. 224, Declaration of Marc Cohn ("Cohn Decl.") Vol. I, D.I. 224-3, Ex. 32, Dr. Briant Report at 74.

After a hearing on disputed terms of the patent hearing under *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 388-90 (1996), the Court construed SMDP to mean that the "inner and outer frame elements have different thickness and different composition." D.I. 130, R&R; D.I. 194, Order adopting R&R. In recommending that construction of the term, the Magistrate Judge rejected Minerva's proposal that the claim term should be construed as "different thickness or width and different composition or treatment that provide different spring characteristics to influence the expandable planar triangular shape of the energy delivery surface." D.I. 130, R&R at 5-6. This Court subsequently overruled both parties' objections to the R&R and adopted the Magistrate Judge's claim construction in its entirety. D.I. 194.

Minerva concedes that its plasma delivery system had been reduced to practice by the start of the AAGL Conference and acknowledges that some preliminary safety tests of that system had been completed.[5] D.I. 279, Minerva Brief at 7; D.I. 248,

---

[5] Minerva argues, however, that only the plasma delivery system, not the SMDP limitation had been reduced to practice at that time.

5

Answering Brief at 5; D.I. 216, Declaration of Neil N. Desai ("Desai Decl."); D.I. 216-2, Ex. 11, Deposition of Akos Toth dated September 28, 2017 ("Toth Dep. I"); D.I. 216-2, Ex. 13, Deposition of Akos Toth dated May 31, 2019 ("Toth Dep. II"). Named inventor Akos Toth testified that Minerva had the frame design well established by late 2009. D.I. 216-2, Ex. 13, Toth Dep. II at 483. Co-inventor Csaba Truckai stated that the dissimilar properties limitation was conceived between July 23, 2009 and November 25, 2009. *Id.*, Ex. 12, Deposition of Csaba Truckai dated October 3, 2017 ("Truckai Dep. I"), at 448. Toth narrowed the timeframe for frame limitation to early- to mid-2009. D.I. 216-2, Ex. 13, Toth Dep. II at 475-76, 481-82, and 484-87.

Minerva's expert, Dr. Paul Briant, stated in his expert report that, based on his review of the record, the invention at issue was conceived no later than November 25, 2009. D.I. 224, Cohn Decl. Vol. II; D.I. 224-3, Ex. 32, Expert Invalidity Rebuttal Report of Dr. Paul L. Briant at 331. Dr. Briant identified and relied on lab notes dated July 23, 2009, to support his opinion on conception. The evidence shows that lab notes were made and kept in chronological order. D.I. 224-3 at 151; *see* D.I. 225-1, Ex. 46, Akos Toth Deposition at 498. Undated pages of a lab notebook that precede a page dated November 25, 2009 shows drawings of inner frame elements with 0.018" thickness and outer frame elements with 0.010" thickness and drawings of inner frame elements with 440A stainless steel and outer frame elements made of 17-4 PH, which have different compositions. D.I. 224-3, Ex. 31, Dr. Briant Rebuttal Report at 156 and 160.

There is no dispute that Minerva attended the trade show from November 16-19, 2009 and displayed a device then known as the Minerva "Aurora" there. Minerva documents detailing upcoming events in advance of the trade show indicates the

company planned to show new product at the show. D.I. 226-5, Cohn Decl. Vol IV, Ex. 85 at 19, Slide deck update dated September 3, 2009, MSI00217670-95. Evidence shows that the device displayed at AAGL 2009 is a prototype of what later became the commercial embodiment of Minerva's '208 patent. D.I. 225-1, Ex. 46 at 513, Toth Dep. A Minerva email shortly before AAGL 2009 includes a rendering of the Aurora device with purple components and "Aurora" printed on the handle. D.I. 253-1 Cohn Decl., Ex. 128 at 731, email from Ron Hundertmark to Vissy. Inventor Akos Toth testified that, although "not a hundred percent sure," he believed that a Minerva prototype was displayed at AAGL 2009 and the device on display was "[l]ikely" the device described in a later Design Review Memo. D.I. 225-1, Ex. 46 at 513, Toth Dep. He conceded that "[o]ur prototype device was shown on the AAGL as a—as a noncommercially available. In fact, we were probably looking for investigators or—yeah." *Id.* He described the prototype as purple in color. *Id.*

Toth's testimony is consistent with the Minerva email from Csaba Truckai requesting "15 full functional" devices and 15 non-functional color devices "[f]or AAGL" with the "[c]olors based on th[e] picture" included therein? [showing a device with purple components] and the Minerva email stating that Minerva's "[b]ooth has been busy. Lots of interested docs including several potential investigators." D.I. 253-1, Ex. 128 at 731, email dated 10/28/2009; D.I. 226-6, Ex. 92 at 61, email from Hundertmark to Michael Regan re update dated November 17, 2009. Other documents corroborate Toth's testimony as well. *See, e.g.*, D.I. 225-1, Ex. 42 at 327-28, Deposition of Daniel H. Beaudet ("Beaudet Dep."); D.I. 225-2, Ex. 53 at 130-53, slide deck, 2009 AAGL Review dated Jan.

25, 2010, HOL-MIN 01026487; D.I. 226-5, Ex. 89 at 73-112, slide deck Board of Directors Meeting dated Dec. 4, 2009 MSI00232756.

One of the named inventors of the '208 patent admitted that the Minerva Aurora was "fairly okay for the purposes" and "performing quite fine" by November 2009. D.I. 225-1, Ex. 46 at 492-93, Toth Dep. Minerva's contemporaneous documents show that on October 23, 2009, Phase I of the FDA approval process was approved and in progress. D.I. 226-4, Ex. 82 at 6-28, Slide Deck, Conceptus; *see also* D.I. 226-5, Ex. 85 at 2-27, Slide Deck, Update. The presentation included photos of a fully assembled prototype being used for pre-clinical studies. D.I. 226-4, Ex. 82 at 6-28, slide deck Conceptus.

In an October 28, 2009 email, Csaba Truckai, who was Minerva's Founder, President, and CEO at the time, instructed the Research and Development staff to build or procure "15 *full functional*" devices and 15 nonfunctional color devices "[f]or AAGL." D.I. 253-1, Ex. 128 at 731, email from Ron Hundertmark to Vissy Laszlo (emphasis added). On December 4, 2009, Minerva explained at a Board of Directors Meeting presentation that Minerva's "Latest R&D Accomplishments" included "[o]ver 100 functional devices built for pre-clinical studies and demonstration." D.I. 226-5, Ex. 89 at 73-112, Board of Directors Meeting slide deck. The CEO's update included references to "VC [venture capital] investment" and M&A [merger and acquisition] discussion, indicating presentations were made to JNJ Ethicon and Hologic at AAGL. *Id.* at 74.

The record establishes that the inner and outer frame elements of the Aurora displayed and used at AAGL 2009 had different thickness and different composition. *See* D.I. 225-1, Ex. 46 at 511-12 and 525-26, Deposition of Akos Toth (identifying lab notebook pages describing the Aurora's frame elements); *see also* D.I. 226-6, Ex. 94 at 99 and 106,

8

Excerpt of Laboratory Notebook 3, Balint Galacz, MSICA00001871-929. Those lab notebook pages show inner and outer frame elements having SDMP. D.I. 226-6, Ex. 94; *see also* D.I. 224-3, Ex. 31 at 155-57 (Dr. Briant relying on same lab notebook pages to show conception of the asserted claims).

Minerva's expert, Dr. Paul Briant, states that the claimed invention was conceived "no later than" November 25, 2009—less than a week after AAGL 2009. D.I. 212 at 7; D.I. 224-3, Ex. 32. The date was qualified with November 25, 2009, as the latest date of conception because two lab notebook pages on were undated, but they preceded pages dated November 25, 2009. *See* D.I. 224-3, Ex. 31, Dr. Briant Report at 154-57, 159-63, 165-70; D.I. 226-6, Ex. 94 at 99 and 106, excerpt of Laboratory Notebook 3, Balint Galacz; D.I. 216-2, Ex. 13 at 505, Toth Dep. II. The referenced undated notebook pages include CAD drawings dated August 13, 2009 and August 31, 2009. D.I. 226-6, Ex. 94 at 106.[6] Further, a July 28, 2009, "Daily Report" shows experimentation with frame elements. D.I. 253-1, Ex. 127 at 726, email from Balint Galacz to Csaba Truckai re daily update with attachment, daily report.

Further, the named inventor testified that conception occurred as early as July 2009. D.I. 225-1, Ex. 46 at 498, Toth Dep. (conception was "after July 23rd of 2009 and before November 25th of 2009, somewhere in between"), and 527 (suggesting conception date of August 31, 2009 "based on looking at this engineering drawing" in lab notebook showing 0.018" thick Type 420 stainless steel inner elements and 0.010" thick

---

[6] Those documents show 0.018" thick Type 420 stainless steel inner elements and 0.010" thick 17-4 PH stainless steel outer elements—the same frame Minerva used at AAGL 2009. D.I. 226-6, Ex. 94 at 106; *see also* D.I. 226-4, Ex. 84 at 40, 52-53; D.I. 225, Ex. 46, Toth Dep. at 227-28, 231, 285-86).

17-4 PH stainless steel outer elements); D.I. 216-2, Ex. 12, Deposition of Csaba Truckai ("Truckai Dep.") at 451 (conception was "somewhere between" July 23, 2009 and November 25, 2009).  The evidence shows that the SMDP limitation was conceived to remedy a "problem" of deformation of the frame (resulting in difficulty removing the ablation device) in early to mid-2009.  D.I. 216-2, Ex. 13 at 475-76, 484, 502, Toth Dep. II.  Inventor Akos Toth testified that "[s]o on—on—on the—on some of these Minerva prototypes, like mid-2009, we—we created multiple combinations, dissimilar, inner/outer, only—I mean, it's a combination." D.I. 216-2, Ex. 13 at 484, Toth Dep II.  Also, he testified "[o]ne thing I can say is in 2009, we were developing an endometrial ablation devise that definitely we needed a solution with—with dissimilar inner and outer properties" and "one thing I know, as of 2009, we did design the device with these features that are already applying these – this [SMDP] idea." *Id.* at 513.  He could not explain why the limitation had not been included in the provisional application filed on October 19, 2010.  *Id.*  When asked when he "first came out with the idea that we should have inner and outer flexure, made of different compositions and thicknesses and what the inner elements—and that the inner elements would have a higher spring constants than the outer elements," Toth agreed that he would point to the lab notebook where the "first experiment where you have a prototype or some setup matching those criteria" could be found.  D.I. 216-2, Ex. 13 at 507, Toth Dep. II.  Toth stated he would point to that date even if the prototype was one that he didn't pursue "because it deformed," explaining

> It might not be the perfect solution, but you already decided that you—you have to -- you have to create two elements that are different.
>
> The fact that one of the—one of the prototypes of a particular device that uses two different material to achieve that.

10

> If it fails because we chose the wrong material, it doesn't mean that we didn't have the idea. We didn't find the right composition for our problems, but we had the idea of what to—what to—what to change, what to modulate.

D.I. 216-2, Ex. 13, at 508.  Further, Toth stated

> It—I would say that to find the solution—so the idea is to—to—to optimize parameters or inner and outer elements and geometry, thickness, width, material, all the—any properties of those parts to achieve the goal. So that's the idea.
>
> To find a way—to find a solution that actually works in the device is a—is—when— when—when you reduce it to practice is when you find your complete combination.

*Id.*  He also testified at length about "optimization," making the device better, though it was already satisfactory.  D.I. 216-2, Ex. 11 at 387, Toth Dep. I; *id.*, Ex. 13 at 476-79, Toth Dep, II.  Toth testified that Minerva continued to refine and improve on the SMDP limitation in early 2010.  *Id.* at 521-24.  The record shows that Minerva continued to refine its product and to incorporate features that are not recited in the asserted claims after AAGL 2009.  D.I. 224-3, Ex. 32 at 201, Dr. Briant Report.  The totality of evidence indicates the SMDP limitation was conceived in the summer of 2009—several months before AAGL 2009 and more than two years before the patent application containing the SMDP limitation was filed.  *Id.*

Also, Minerva documents dated shortly after AAGL 2009 demonstrate that the claimed invention had been displayed at the trade show.  Minerva's exhibitor booth at the show was open to the public—visitors did not need to sign nondisclosure agreements to see it.  D.I. 216-2, Ex. 10 at 342, Deposition of Csaba Truckai dated October 3, 2017; D.I. 225-1, Ex. 46 at 513, Akos Toth Dep.  On November 18, 2009, during AAGL 2009, Minerva's R&D team asked for a summary of the feedback Minerva was receiving from potential customers.  D.I. 226, Cohn Decl. Vol. IV, D.I. 226-5, Ex. 88 at 69, email from

Michael Regan to Ron Hundertmark re Phase I design review with attachment, summary of comments from AAGL and Medical Advisory Board meetings Nov. 16-19, 2009, dated Nov. 23, 2009. Those comments were compiled and presented to Minerva's R&D team for a design review. D.I. 226-4, Ex. 84 at 37 ("Summary of comments from AAGL & Medical Advisory Board Meetings November 16-19, 2009"); D.I. 225, Cohn Decl. Vol. III, D.I. 225-1, Ex. 46 at 513, Toth Dep. Minerva also presented the public's feedback from AAGL 2009 to its Board of Directors. D.I. 226-5, Cohn Decl. Vol. IV, Ex. 89 at 100. The design drawing of the inner frame element marked "DRAFT" attached to the Design Review Memo is the same design drawing in Mr. Galacz's lab notebook on which Minerva relies for its purported date of conception. *Compare* D.I. 226-4, Ex. 84 at 53, with D.I. 226-6, Ex. 94 at 106.

A photograph of Minerva's booth at AAGL is further evidence that the Aurora was publicly displayed at AAGL 2009. Also, the record shows that the Chairman of Minerva's Medical Advisory Board, Dr. Andrew Brill, gave an open presentation about the Aurora EAS at AAGL 2009. D.I. 223-5, Ex. 17 at 2-3, Journal abstract; D.I. 225, Cohn Decl. Vol. III, D.I. 225-1, Ex. 49 at 740, Deposition of Dave Clapper; D.I. 223-4, Ex. 16 at 57, Final Program; D.I. 226-5, Ex. 85 at 18, September 3, 2009 update. Dr. Brill's presentation is evidence that corroborates the fact that Minerva's Aurora existed and was publicly displayed at AAGL 2009. *Id.*

Documents dated at or near the date of AAGL 2009 show that the purported invention was ready for patenting at the time. Those documents include a list of "[a]ctions required from the evaluation of the extirpated uterine studies and AAGL show results" and a summary of "Product Comments" from AAGL 2009 from physicians who offered

comments about the "[f]rame flexibility" or the "[f]lexibility of shaft" and the "ergonomic design of the handle"—comments that could only have been made based on a review of an actual device that had been reduced to practice. D.I. 226-4, Ex. 84 at 36-37, email dated November 24, 2009. The uterine study summary also confirms that "[a]ll Minerva devices (n=13) were successfully deployed and conformed to the uterus." Id. at 38. Further support for the proposition that the device was ready for patenting is found in an October 14, 2009 Minerva "Board of Directors Meeting" presentation that included an update on Minerva's progress on the Aurora, including the "[n]ine extirpated uterine studies completed" to date and promising device performance results. D.I. 226-5, Ex. 86 at 31, 41-49. Mr. Toth testified that by 2009 the Aurora was "fairly okay for the purposes" and "performing quite fine." D.I. 225-1, Ex. 46 at 492-93, Toth Dep.

II. Law

    A. Summary judgment

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). On motion for summary judgment, the court views the evidence and any disputed factual issues in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A patent is presumed to be valid, 35 U.S.C. § 282 (1994), and this presumption can only be overcome by facts supported by clear and convincing evidence to the contrary. *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed.Cir.1999); *see also Impax Labs., Inc. v. Aventis Pharma., Inc.*, 545 F.3d 1312, 1314 (Fed. Cir. 2008).

B.   Invalidity – Public Use under § 102(b)

Under pre–AIA law, "[a] person shall be entitled a patent unless . . . the invention was . . . in public use in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b).[7]  That proscription, known as the "on-sale bar" provides:

> A person shall be entitled to a patent unless—
>
> (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or
>
> (b) the invention was patented or described in a printed publication in this or a foreign country *or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.*

35 U.S.C. §§ 102(a)-(b) (emphasis added); see *Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 139 S. Ct. 628, 632 (2019) (finding that that when Congress reenacted the same language in the AIA, it adopted the earlier judicial construction of the phrase "on sale bar").  Under that provision, an invention in public use or on sale more than one year before the patent application's filing date is not entitled to patent protection.[8] *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1383 (Fed. Cir. 2005).  The ultimate determination that a product was in public use or on sale under 35 U.S.C. § 102(b) is a

---

[7] Hologic does not assert § 102(g) as a defense in this case.  D.I. 242, brief at 24.

[8] Courts refer to the date one year before the application filing date as the "critical date." *Orion IP, LLC v. Hyundai Motor America*, 605 F.3d 967, 974 (Fed. Cir. 2010) ("The critical date is defined as the date one year prior to the filing date of the patent application."); *Motionless Keyboard Co. v. Microsoft Corp.*, 486 F.3d 1376, 1383, 82 U.S.P.Q.2d 1801, 1806 (Fed. Cir. 2007) ("Because the applicant filed the '477 patent on June 6, 1991, the critical date for the invalidity analysis is June 6, 1990 . . . To sustain the invalidity determination, the record must show that an embodiment of the patented invention was in public use as defined by the statute before the critical date.").

14

question of law based on underlying facts.[9] *Polara Eng'g Inc v. Campbell Co.*, 894 F.3d 1339, 1348 (Fed. Cir. 2018) (quoting *Lisle Corp. v. A.J. Mfg. Co.*, 398 F.3d 1306, 1313 (Fed. Cir. 2005)).

The public use bar is triggered "where, before the critical date, the invention is in public use and ready for patenting." *Invitrogen Corp.*, 424 F.3d at 1379. "[A]n inventor's commercial exploitation of his invention before the critical date create[s] a public-use bar—"regardless of how little the public may have learned about the invention." *BASF Corp. v. SNF Holding Co.*, 955 F.3d 958, 967–68 (Fed. Cir. 2020) (quoting *Metallizing Eng'g Co. V. Kenyon Bearing and Auto Parts Co.*, 153 F.2d 516, 520 (2d. Cir. 1946); *see also Kinzenbaw v. Deere & Co.*, 741 F.2d 383, 391 (Fed. Cir. 1984) (finding farmer's testing of product a public use, noting that in using "the machines to test them for Deere, the farmers served Deere's commercial purposes"); *but see Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1383 (Fed. Cir. 2005) (secretly using an invention internally to develop future products that were never sold, without more, is insufficient to create a public use bar to patentability).

The "ready for patenting" condition "may be satisfied in at least two ways: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67-68 (1998); *see Art+Com Innovationpool GmbH, v. Google*

---

[9] Because the '274 patent's filing date predates the amendment to § 102 made by the Leahy-Smith America Invents Act (AIA), Pub. L. No. 112-29, 125 Stat. 284 (2011), any reference to § 102 refers to the pre-AIA version of the statute.

*LLC*, 712 F. App'x 976, 983–84 (Fed. Cir. 2017) (holding that the Supreme Court's "ready for patenting test" set forth in *Pfaff*, a case concerning § 102(b)'s on-sale bar, "applies to the public use bar under § 102(b)"). "Ready for patenting," can be shown "by proof of 'reduction to practice' or drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention.'" *Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 139 S. Ct. 628, 633 (2019) (quoting *Pfaff*, 525 U.S. at 67-68). Conception is complete when an idea is definite and permanent enough that one of skill in the art could understand the invention. *Dana-Farber Cancer Inst., Inc. v. Ono Pharm. Co.*, 964 F.3d 1365, 1372 (Fed. Cir. 2020), *cert. denied*, No. 20-1258, 2021 WL 2044661 (U.S. May 24, 2021). An inventor need not know, however, that an invention will work for its intended purpose in order for conception to be complete, as verification that an invention actually works is part of its reduction to practice. *Id.; see also Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 659 F.3d 1186, 1193 (Fed. Cir. 2011). An "invention is reduced to practice when it works for its intended purpose"—that is, "when there is a demonstration of its workability or utility." *Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1366–67 (Fed. Cir. 2008). When testing is needed to establish that an invention worked for its intended purpose, the inventor must have recognized that the tests were successful. *Streck, Inc.*, 659 F.3d at 1193; *Estee Lauder Inc. v. L'Oreal, S.A.*, 129 F.3d 588, 594–95 (Fed. Cir. 1997).

A working prototype can demonstrate the workability and utility of the invention. *Atl. Attachment*, 516 F.3d at 1367; *see also Hamilton Beach Brands, Inc. v. Sunbeam Prods., Inc.*, 726 F.3d 1370, 1378–79 (Fed. Cir. 2013) (finding a prior art product ready for patenting when there were "working prototypes" that "met all the limitations of the

16

asserted patent claims" and retail customers were provided with "specific descriptions" and "drawings" of the device); see Art+Com, 712 F. App'x at 983–84 (finding a demonstration at a public conference and provision of source code to individuals at Art+Com constitutes substantial evidence that a product was "ready for patenting.") An invention may be reduced to practice for purposes of the public use bar "even though it may later be refined or improved." Id. at 984; see also New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co., 298 F.3d 1290, 1297 (Fed. Cir. 2002).

Oral testimony asserted to invalidate a patent must be corroborated, but "[t]he corroborating evidence can include documents and testimonial evidence," and "[c]ircumstantial evidence can be sufficient." TransWeb, LLC v. 3M Innovative Props. Co., 812 F.3d 1295, 1301-02 (Fed. Cir. 2016) ("We have repeatedly noted that contemporaneous documentary evidence provides greater corroborative value."). Further, although invalidity must be proven by clear and convincing evidence, "[a] 'rule of reason' analysis is used to determine the sufficiency of corroboration, under which 'all pertinent evidence is examined in order to determine whether the [witness's] story is credible.'" Id. at 1301 (quoting Sandt Tech., Ltd. v. Resco Metal & Plastics Corp., 264 F.3d 1344, 1350 (Fed. Cir. 2001)). "Importantly, this analysis 'does not require that every detail of the testimony be independently and conclusively supported' by the corroborating evidence." Id. at 1301-02 (quoting Ohio Willow Wood Co. v. Alps S., LLC, 735 F.3d 1333, 1348 (Fed. Cir. 2013)). Questions of fact are "amenable to summary judgment in cases where no reasonable fact finder could return a verdict for the nonmoving party." Id. at 1307.

III. DISCUSSION

The Court rejects Minerva's argument that Hologic has not presented clear and convincing evidence that the claimed invention was publicly used at AAGL 2009. The Court finds that no reasonable juror could find that the prototype exhibited at the trade show was something other than the invention that Minerva later attempted to patent. Voluminous contemporaneous evidence shows a prototype of the accused device that contained all the relevant limitations of the asserted claims, including SMDP, was in public use more than a year before Minerva filed its patent application. Importantly, the inventor testified that he conceived of the SMDP solution to the problem of deformation in the summer of 2009 although the invention was not optimized at that time. Corroborating evidence includes feedback from physicians who observed or handled the Aurora at AAGL 2009, a presentation in an open session at AAGL 2009 by the Chairman of Minerva's Medical Advisory Board, presentations to Minerva's Board of Directors, mechanical drawings, laboratory notebooks, contemporaneous pictures, emails and internal correspondence, and testimony of individuals who attended the trade show.

Minerva's core technical documents, internal development communications, Board of Directors presentations, and communications with physicians and potential investors both before and immediately after the trade show refer to a device that Minerva had designed, assembled, and was clinically testing with inner elements made of 0.018" thick Type 420 stainless steel and outer elements made of 0.010" thick 17-4 PH stainless steel, i.e., frame elements with different thicknesses and compositions per the Court's construction of SDMP. It relied on that prototype to solicit investors and venture capital. The evidence shows that Minerva reduced its inventions to practice by making functional

prototypes embodying SDMP before AAGL 2009. During the Summer of 2009, Minerva tested its prototype device in extirpated human uteri to show that it would work for its intended purpose. Akos Toth, the inventor, testified that "we built prototype devices that were fairly okay for the purposes, and I'm sure we built some that has 420 materials in the -- as the [inner] member and they were performing quite fine." D.I. 216-2, Ex. 13 at 499-500, Toth Dep. II. The device was ready for patenting in that Minerva also possessed drawings and detailed descriptions that would enable a person skilled in the art to practice the purported invention, including design drawings specifying inner elements made of 0.018" thick Type 420 stainless steel and outer elements made of 0.010" thick 17-4 PH stainless steel that pre-date AAGL 2009 by several months and that include more detail than the disclosures in the '208 patent specification.

In the face of such overwhelming and corroborated evidence, no reasonable juror could adopt the improbable scenario that the prototype Minerva displayed, presented on, and featured in its trade show booth and marketing materials in November 2009 could not have been a device with SDMP because the dissimilar materials limitation was not conceived until a few days after the conference. Even its own expert's testimony on conception includes the qualifier that November 25, 2009, was the latest date conception could have occurred. Clearly, the device Minerva touted at AAGL 2009 was the same device that later evolved into the commercial embodiment of its '208 patent. Minerva's technical documents, internal communications, Board presentations, and communications with physicians and potential investors, both before and closely following AAGL 2009, show a prototype with SMDP elements as construed by the Court. Minerva commercially exploited its invention before the critical date. Further, no reasonable juror

could find that Minerva conceived of the invention on November 25, 2009 and worked diligently to reduce it to practice before filing its patent application on November 7, 2011. Accordingly, the Court finds the claims of the patent are invalid by reason of the public disclosure and on-sale bar found in 35 U.S.C. § 102(b).

IT IS ORDERED:

1. Defendant Hologic's motion for summary judgment of invalidity (D.I. 208) is granted;

2. Plaintiff Minerva's motion for a summary judgment of validity (D.I. 210) is denied.

3. The parties' cross motions for summary judgment on infringement (D.I. 200 and D.I. 206), Hologic's motion for summary judgment of no lost profits (D.I. 211); Hologic's motion for summary judgment of no willful infringement (D.I. 214); Minerva's motion for a partial summary judgment of validity under 35 U.S.C. § 112 (D.I. 198) and Minerva's motion for partial summary judgment on defendants' affirmative defenses and counterclaim (D.I. 204) are denied as moot.

4. A Judgment of Dismissal will issue this date.

DATED this 23rd day of July 2021.

BY THE COURT:

s/ Joseph F. Bataillon  
Senior United States District Judge